at all? Mr. Wisdom, along with my co-counsel, Robert Spence, I represent the appellants in this matter, Kenneth Abrams and Patrick Collard. As this Court is well aware, this is a case involving the denial of qualified immunity. The appellants here were alleged to have violated the Eighth and Fourteenth Amendment rights of the appellee's father, Mr. Philip Anderson, by being deliberately indifferent to his serious medical needs while he was housed in the Tuscaloosa County Jail. At the summary judgment in this case, both of these appellants that I represent asserted that they were entitled to qualified immunity. At this point, it is not enough for the appellee plaintiff to simply demonstrate that a genuine issue of material fact exists on the merits of the claim. Instead, the appellee must overcome Abrams and Collard's assertion of qualified immunity. He has got to prove that Abrams and Collard violated Anderson's constitutional rights and he has got to prove or establish that the constitutional right was clearly established at the time Abrams and Collard acted. It matters not in which order the trial court addresses these questions, but in order for qualified immunity to be denied, both have to be established at the summary judgment level. Here, we argue neither a constitutional violation was established by appellee, nor was it clearly established law that the appellant's conduct in this matter was unconstitutional. Well, is it an open question as to how often the appellants checked in on the situation? Were they on duty the entire time he was in the jail? No, Your Honor. In fact, they were on duty at various times during Mr. Anderson's eight-day stay. The penultimate time…  Yes, Your Honor. Now, back up. Were they there earlier when the supervisor was told he was complaining of stomach pain or was it some other supervisor? There were other supervisors who were given that… Don't we have questions of fact there as to what, you know, how closely they were attenuated to the situation? I think that would be properly defined as a question of fact, yes. And if there were questions of fact that are open, doesn't that deprive the court of jurisdiction? I don't think so, Your Honor, because I think what the question… Are you saying there's an absolute immunity for these individuals regardless of what they may have known or done? No, I'm not saying that at all, Your Honor. What I'm saying is that qualified immunity is immunity from suit. And the purpose of this immunity is obviously to avoid trial. And so, the questions that must be answered in the qualified immunity analysis are whether or not a constitutional violation has been established at all under the undisputed facts currently then before the court. And even if that is established, whether or not there was fair notice to these defendants that their conduct or the conduct that's before the court and the record that they're accused of would have been considered unconstitutional. Well, let's just say for the sake of discussion that the man had a broken femur and they were told, oh, we're taking care of it, and the bone was protruding through the skin and nothing was done. And they came back a second time and said, he's still complaining about his leg, but we're taking care of it. We're the medical team and we're taking care of it. Are they not required to look and say, wait a minute, let's be real about this. This guy's got to go to the orthopedist at the hospital now. I think absolutely they would in that scenario. However, it's completely distinguishable from this scenario. It is. It is. And I might add, Your Honor, there are cases where an exposed femur may be left that way intentionally prior to surgery so that it can be debrided and cleaned and infection doesn't set in. If that were the case, would you want a jail official with no medical training overruling what a licensed physician of more than 40 years was telling him was not something to  Well, that's the question. Right. Well, and I think the answer is no. We don't want our jail officials supplanting their thoughts, their opinions for a medical . . . somebody with an MD behind his name. The purpose of that and the challenge of getting into medical school is just that. We want our brightest and best doing that kind of work. We task our jail security officials with a much different set of rules and jobs. Performing reviews of medical diagnosis is not one of those jobs. And just like we have in the civil medical malpractice scenario where we don't punish doctors who attempt to diagnose but make mistakes, instead we punish doctors when they breach a standard of care. We've got the same thing here where the jail officials were given specific information which is one, Mr. Anderson is suffering from what they diagnosed as constipation. That's not really a life-threatening ailment. It's probably an affliction every human on the earth has at one time or another endured even from infancy throughout elder age. Two, they were told and they knew he had been seen by the jail's physician, several different nurses and three, they were told each time he's okay to return to his cell. What about the nurse's statement and I'm not clear who she made it to, but the nurse's statement was just leave me alone, I'm not going to lose my job over this, I'm not going to send him to the hospital, my superiors say no. Was that not enough to put them on notice that this was not a medical judgment and that maybe some intervention was appropriate? It might have been, Judge, however, there's no record evidence that these two individuals heard that or were present when that was said. What does the record evidence indicate, who did she say that to? The record evidence indicates that she said that in front of some inmates who gave declarations that were submitted after we filed our initial brief and the motion for summary judgment. I am arguing that in this case, you can't ask jail officials to impute knowledge that we now have . . . Of course, we have additional evidence in this case than simply that, do we not? We have evidence that Abrams and Collard yelled at him, accused him of faking even until the day of his death, and at one point, one of them threw him down or put him up just to suggest that he was just not to be credited or believed. Correct, Your Honor. That goes beyond simply saying, gee, I relied on what the nurses or the doctors told me. Even if it does go beyond that . . . Well, it does, does it not? It's not a question of even if. Well, the facts have to be taken in the light most . . . We have to accept that. We have to accept that. We're accepting that. Even if we accept that, my argument would be that lets you know or lets the court or the district court know that they don't fully appreciate the substantial risk of serious injury that this man faces. If they think he's faking, they're not appreciating that he could be suffering from a substantial health risk. And that is the first requirement of the subjective component of a deliberate indifference claim. You have to establish that these guys recognized that there was a substantial risk of injury or harm to this prisoner. They didn't. Even the evidence submitted by the appellee himself on page 615 of the appendix, which I think he, and I quote that he says, these jail officials failed to properly appreciate the severity of Anderson's symptoms and the urgency of his condition. This is their own experts saying . . . How do you square that with the fact that it wasn't too hard for detention officer Van Horn to earlier on and continuously discern something was seriously wrong here? Well, it's interesting that detention officer Van Horn didn't do anything about it either. He's now . . . Didn't he report it to his superiors? . . . a former employee, but . . . Didn't he report his concerns to his superiors? Am I wrong about that? He did report to his superiors, which were not the two appellants that we're here about today. What do you think he should have done? Well, I suppose the appellee would argue that he should have called some transportation for him to leave the hospital and see a second medical provider. But what I think he did was alert someone, his supervisor, that this issue needed to be looked into further. Well, he did more than that. He immediately contacted his supervisor and he said that Anderson, quote, was in very seriously bad shape and needed immediate medical attention. And after being told that he had already seen a nurse, he said that he responded that, quote, someone had to do something immediately for Mr. Anderson and that whatever the nurses had been doing for him was obviously not working. He was in terrible pain, short of breath, and barely able to move. And Van Horn went on and said Anderson, quote, was obviously in serious, critically bad shape in need of serious immediate medical treatment. Everyone present could readily see that. And Van Horn said, if we credit it, that he took it upon himself to repeatedly check on Van Horn's health. So we have something more here than do we not? We do, Your Honor. However, who was present? Van Horn's statement says everyone who was present. Not Abrams and not Collard. Do we know that from the record? We do know that, Your Honor. They didn't even come back on duty until 7 a.m. of the 15th. All of Van Horn's statements occurred while he was on duty and the two, Abrams and Collard and Van Horn were not on duty simultaneously on the 14th and 15th, which were the two last days of his incarceration, the 15th being Apley's death. Well, didn't Van Horn testify that the typical protocol would be when they came on duty that morning they would have read the reports or been informed of the activities of the night before so one could reasonably infer they would have been on notice of what had transpired? Yes, he did say that. And there are 550 to 600 inmates in the Tuscaloosa County Jail at any given time. They came on at 7 o'clock. Abrams first made contact with Mr. Anderson at approximately 9.30 a.m. He was assisted with one of the nurses. They helped him out of his bunk to the bathroom, again, thinking he's suffering from extreme constipation. Mr. Anderson makes a bowel movement. The nurse instructs that they don't flush so she can examine it. Abrams helps him back into his bunk. At that point, there's no record evidence that he's vomiting, moaning, screaming, any of this. They're thinking in their minds as jail guards, this is finally starting to work. He was constipated or so we're being told. He's now had a bowel movement. We're returning him to his bunk. The nurse doesn't seem concerned enough that we need to do anything further. Why should I interject my opinion here? I'm a layperson. I think that these two individuals who are being threatened individually with financial liability in this case, the United States is the defendant that's admitted liability for the mistakes of their employees in this matter, the medical staff. But these two young men are being threatened individually with personal liability when they should have been shielded by qualified immunity. I see that. Thank you very much. Thank you, Your Honor. May it please the Court, I'm David Schoen representing the appellee in this case. I'd like to first address some of the questions that were raised and some of the answers that were given because some of the facts told to the Court really don't match up with the record. For example, Judge Kelly, you asked early on whether these supervisors were told about the stomach pain or others were. Mr. Wisdom maybe misspoke but said those were other supervisors. Simply not true. The record here shows, which of course as we all know must be taken in light most favorable to the appellee and accepted as true for these purposes. They show in the inmate affidavits 86-2, 86-3, 86-4 that Collard and Abrams were not just there sporadically. They were there as the supervisors on this cell block, Collard on February 8th. That's 86-1 at 3. And both of them, Collard and Abrams were the supervisors on this cell block 11 with Mr. Anderson on February 9th, February 10th, February 14th, and February 15th. And that's 86-1 at 3, 5, 8, 23, and 25. They were there at all times, five of the eight days he was there, seven and a half days, and they saw as the inmates have testified over and over again, screaming, moaning, begging for help. This case is a lesson in humanity. The other inmates in this cell block picked up Mr. Anderson, carried him to his bed when the guards wouldn't raise a hand to help him. Not only didn't they raise a hand, they called him a faker. They called him a liar. They laughed at him. They made fun of him. And they're concerned now that they might face liability for that. They should face liability for that. That's how our system works. Well, how egregious does it have to get before a layperson oversees or supersedes the medical personnel on scene? Two answers to that, Judge Kelly. Very good question, of course. First, there is no yardstick, exactly how serious, but it's something that should be obvious to a layperson. In this case, the lay witnesses and the medical witnesses said this kind of condition was a serious medical need, obvious to a layperson as such by any standard. But let me get to the second question, second part of that question, because there's really a misnomer here. No one's asking jail officials to overrule the medical staff here. The medical staff was absent in this case. They treated this man with antacids, cursory treatment. Judge Carnes has recognized in an opinion in a case Your Honor sat on, as the court recognized in Mandel v. Doe a long time ago, cursory treatment is the same as no treatment at all for these purposes. So what these two saw, Collard and Abrams, on a daily basis was the continuing worsening condition. And that's why Your Honor's question about the bone exposed from the leg, it's not just distinguishable. If it's distinguishable, it works in our favor. This was much more obvious and much more serious. Do we have a question of fact here? Well, there's a question of fact because these... And if there's a question of fact, do we have jurisdiction? I think the court has jurisdiction over this. I think that the answer is summary judgment could not be granted in this case because there are material issues of fact, but they're also wrong in the law. I just wanted to come up with, just respond to a couple of other things that were discussed here. But I want to be clear. There was no overruling. There was no overruling. This has been a constant theme that we're asking jail officers to overrule the medical staff. Judge Carnes mentioned the statement that the nurse made. Mr. Wisdom said, well, that statement was only made to a couple of inmates who gave their testimony after a summary judgment was filed. Not true. The record shows that that statement was made to at least two correctional officers who gave statements acknowledging that. Well, do you think that makes it as a matter of law or just a, I mean, a jury is going to determine whether the defendants were deliberately indifferent? Yes, Your Honor. Not us. That's right, Your Honor. But it must go to a jury for that question. It brings me back to my question. If there are questions, material questions of fact in dispute, do we have even jurisdiction over this appeal as opposed, you don't want us to say as a matter of law they're responsible. No, I'm not asking that, Your Honor. I really hadn't given much thought to the jurisdictional question. It hadn't been raised. However, you know, we are all familiar with the idea that the denial of qualified immunity, summary judgment based on qualified immunity, generally is the exception to the no interlocutory appeal rule and that denial is generally because there were material disputes, material facts in dispute. In any event— As to the nurse business, I mean, what I think we'll have to do when we go back, assuming we have, we adopt a principle that there are circumstances in which a correctional officer should take action. In fact, our case law has already done that. We're going to have to chart this out to figure out what these two officers knew. So you said the nurse made the statement to two correctional officers. Essentially, I'm not acting as a nurse anymore. We've just, we've thrown up our hands. We're not going to do anything for this man. How do we attribute the knowledge from those two correctional officers? How do we get that knowledge to these two defendants? Well, first of all, I don't think there's anything in the record that directly attributes knowledge of that statement to these two. It may be that it was well-known around there. It may be because of these notes and so on. I don't think there's anything. I don't necessarily rely on that. That's atmospherics of what was going on there, and that was also relevant as to the liability of the medical provider, which, by the way, put this plaintiff and their family through hell for two years before they admitted liability for medical malpractice and wrongful death, unprecedented in my experience, at least, in over 30 years of these cases. That's how egregious this was. But in any event, what was obvious and clear to these two correctional officers on a daily basis was that they had an inmate who was lying on the ground, unable to move, screaming, begging for help, that other inmates were begging for help, and he wasn't getting it from this cursory treatment that the so-called medical providers were providing. Did they know that he was only getting cursory treatment? Well, first of all, their testimony is at odds, as I mentioned in a footnote here. On the one hand, they say they had very limited contact with him and didn't know about his medical condition. On the other hand, in discovery, they said they sent him to medical 16 times. Whether they knew or not, they had an inquiry duty, and that's what our cases have also said, that the jail officials have an inquiry duty. Before I finish, I want to get to the cases, in a second, to the cases that completely destroy this idea that there's no independent obligation of jailers to seek and get the required medical help. I don't think his argument went quite that far. Well, Your Honor, his argument clearly is that jailers are entitled to- His argument is that under the particular circumstances of this case, they were not obliged to do more than they did. Not that there might not be other circumstances where they would have been required to do more, but simply that it didn't attach to them here. I'm not saying it's a convincing argument. Maybe it is, maybe it isn't, but that's their argument. Not that under no circumstances could they ever be obliged to do anything more. I wish that were their argument, Judge, and I don't have to win this battle. However, they refuse to acknowledge any of the cases that do clearly establish this right. And today, the court heard again that we shouldn't be in the business of asking jailers to overrule a doctor who's been a doctor for 40 years, et cetera. This doctor said, I can't see him for a few days. That's how this doctor operated in this case. In any event, just a couple of other things from this. Oh, yeah. The idea that a defense to it is, well, he thought these- jailers thought they were faking, therefore they didn't appreciate the significance of the risk, therefore they should be absolved of liability. That's absurd. And it also has been specifically rejected. In one of the cases I'm going to tell the court about that establishes the right, the jailer had a policy of never believing inmates. They're all liars. They're all fakers. And the court said, that's a policy of deliberate indifference. That doesn't remove the subjective knowledge requirement. And the serious medical need here, by the way, is an objective component of the case. In any event, yeah, right. So that's that part of it, that he couldn't have had the subjective knowledge because they didn't appreciate it. All right. You know the facts of the case very well by now. The medical testimony in the case is undisputed, both as to the obvious and serious nature of the condition and proximate cause, that had they just responded, had they not delayed, this is a case that has the whole panoply of deliberate indifference. It's clear deliberate indifference, but it's also delay, it's cursory treatment equals deliberate indifference. It has something for everyone in this case, frankly. And so when Collard and Abrams came on duty at seven o'clock in the morning on the 15th, for example, that's the end of it. Remember, he came in the night of the 7th, 15th, he's dead from an ulcer. Nobody dies of an ulcer. Oh, that's not, that's not correct. No. A duodenal ulcer, perforated. A lot of people die from that. Absolutely right. I didn't finish my statement, Judge. If they get treatment. Nobody dies of an ulcer in 2015 if they get treatment. This was recognizable by any, it's the medical, undisputed medical testimony. These symptoms and this condition was recognizable with treatment, easily treated. Easily treated. He doesn't die. That's the medical testimony undisputed in this case. I don't mean to suggest for a second that a duodenal ulcer is not a serious condition that could lead to death. In any event, undisputed medical, oh, so they come to work at seven o'clock on the 15th and Dr. Kayyad said, he's the head of gastroenterology at Grady Hospital here, said that just a matter of hours had they treated him when they knew what happened from reading the notes on the 14th. And by the way, they were on duty on the 14th. The record shows that. So they were on duty, day shift on the 14th. By the time Van Horn gets there for the evening shift, he says, he finds Mr. Anderson unresponsive, unable to move. He couldn't answer questions. He was sweating profusely. The other inmates told him, this guy is in terrible shape, serious, bad shape. This is all the undisputed, not undisputed. This is all the factual evidence that must be accepted as true. So the medical expert says, even in a matter of hours, had they simply sent him to the ER before he goes into cardiac arrest, they could have saved his life. The risk certainly would have been greatly lessened. It's just that simple. Now, as to this, by the way, the idea that they have no independent duty otherwise, their own policy manual says they have an independent duty. Their own policy manual, it's in the record, it's page 23 of that exhibit, in the record, that is, I'm sorry, 86-7 at page 23, says that ordinarily, medical staff should refer to the emergency room. But in extenuating circumstances, a supervisor has an obligation after, by the way, also getting all of the training they're supposed to get to recognize these kinds of conditions, independent obligation for the jail supervisor to also send him to the ER. That's their own policy that they ignored. And Judge Carnes, by the way, in that other case I mentioned, it's called McBride, Your Honor mentioned that the policy is relevant to inferring whether a conduct was appropriate or not. Let me just, I have three minutes left. I know that the court said that, you know, the court doesn't understand their argument to be that in all circumstances they wouldn't have this duty. That has been their argument all along. Jailers don't overrule medical staff. Medical staff says it's constipation, it's okay. That's it. And in any event, even if we're wrong about that, there's no clearly established law. They've said it over and over and over again, wrong. Since at least 1988, in Carswell v. Bay County, 854 F. 2nd 454, it has been clear, in that case, by the way, it was a pretrial detainee. They thought he was suffering from constipation. He had a weight loss, he had a rash, but they thought it was constipation. Well, it wasn't. It was diabetes. A lawyer at one point said to the jail administrator, you know, get him some medical help. So he came back to the jail and he said, get him some medical help. He needs medical help. He was seen many times by medical staff, but the condition was obviously not just constipation. The guy lost a lot of weight while he was in there and there were other symptoms. And so they saw his condition worsening. And the court clearly said that in that case, that it is no defense that they simply were relying on medical treatment in the case. So that's Carswell v. Bay County. That may be the strongest case. And that's back 1988. In the subsequent cases, they all cite to Carswell. In our case, the medical condition was far more serious and far more obvious. But Dobert v. Lee County is sort of the classic case here. That's 5-10, F-3rd, 13-12. This was the pregnant inmate whose amniotic fluid was leaking for 11 days. Again, many medical visits, treatment, treated because she was pregnant and so on. She complained. She asked for help. They didn't give it to her. The fact that she was seen by a doctor, the court said at 1327, does not mean that a lay person can't still independently tell that she had a serious medical need that wasn't being addressed. In this case, it was a jailer, a captain being sued. He had a duty, the court said, to look further into this, into the treatment she was getting, the condition she was suffering from, and to get her the help. A policy of willful blindness, washing your hands of the matter by saying, I referred it to medical, is no defense and cannot absolve jail staff from liability. Howell v. Evans, 1991 case, 9-22, F-2nd, 7-12. Inmate died of an asthma attack. By 1991, the law was clearly established that a reasonable jail official would have known that action was required to take, when you see a worsening condition, take action. And there's a clearly established right to the same. And again, to say, I always defer to medical staff, is a policy of deliberate indifference. Finally, the case I mentioned before, Judge Karn's case, it's distinguishable on the facts to some degree, but there are some important principles. A per curiam decision called McBride v. Houston County Health Care Authority, 658 Fed Appendix 991, 11th Circuit, 2016, however, it's referring to events that happened in 2012. A jailer, Your Honor said in page 999, or the court said, I'm sorry, I sat on the panel with Judge Jill Pryor and Judge Jordan, learning about a headache and a sore throat, so painful that the inmate was unable to eat or drink for four days with a severe rash and peeling lips, screaming for help, asking for help, deliberate indifference for the jailer not to get that inmate help, case was sent back, summary judgment was wrong as to that jailer. I submitted a 28-J recent case, which also has some principles, it doesn't go to the clearly established, it's a 2019 case, however, it reaffirms that these principles are all still alive. That's where we are in this case. This is a horrific case. This is a case in which jailers must be held to task for their conduct. This is not a case that qualified immunity was meant to apply to in any way, shape, or form. We have the medical evidence, we have the factual evidence in the case, I see my time is up. Last thing I want to say, I especially want to welcome you, Judge Kelly, because if my research is right, you were born in Freeport, New York. I was. So was I. So was my mother. So was my father. Thanks very much, Mr. Shor. Mr. Spence, you get the last word here. Thank you, Your Honor. Where were you born, Mr. Spence? Lincoln, Nebraska. Can't help you on that one. I do want to go back to the plaintiff's expert, Dr. Kayyad. Not only did he say that the jail staff, and he refers to them generically, but he says the jail staff failed to properly appreciate the seriousness of— Let me start by asking you this. You are not asserting, are you, that a jailer could not be liable for deliberate indifference just because the inmate had been seen by medical staff, are you? No. We're not saying that. But in this case, the inmate was seen by medical staff— And our law is clearly established, is it not? And was clearly established at the time, is it not? And your clients, therefore, would have been on notice at that time that they were not free with impunity to ignore a deteriorating, serious medical condition where an inmate was begging for help, was doubled over in pain, et cetera, simply because he had seen a nurse or a doctor earlier. Not simply because he had seen a doctor or a nurse, but let me just refer to Townsend v. Jefferson County, a 2010 case. This is a miscarriage case, and the court went through some facts. Each deputy knew that the medical professional, Nurse Langston, had seen and spoken with Townsend. Each deputy was aware that Nurse Langston had determined that Townsend's condition was not an emergency, and the court concluded, in the light of this evidence, no reasonable jury can conclude that either Chambers or Daniels knew that Townsend's situation was an emergency. I think that's much more analogous to this. It's clear, the record is clear, that Mr. Anderson was seen by the medical staff on multiple occasions. Of course, we have incoming shifts that don't always know what's going on, but with the process. Right. The critical language in Townsend v. Jefferson County was that he had not presented evidence that the situation was so obviously dire that two lay deputies must have known that a medical professional had grossly misjudged the condition. Do we have the same thing here? I think it's pretty close. Why? The medical staff has . . . Taking the facts in a light most favorable to the non-moving party here, why is that so? It doesn't jump off the page at me. If I could step back just a minute and go back to Dr. Kayyad's expert opinion. This is on page 615 of the record. He says that it's likely that the rupture of the ulcer occurred the night of February 14th. Then he goes on to say subsequently his condition was followed by slight improvement in the morning of February 15th. Of course, these two officers come on duty on the morning of February 15th. They go down to check on him at approximately 9.30 in the morning. There's no evidence that at that point he's moaning and groaning. In fact, their testimony is that he appears to be watching TV. But they ask him what's wrong and he says, my stomach hurts. I haven't been able to have a bowel movement. And they say, let's go to medical. So he stands up and he says, wait, I've got to go to the bathroom. The nurse, the medical unit's right across the hall from his dormitory, the nurse comes over and says, we're treating him. And he has a bowel movement while they're there. So the evidence before these two officers is an inmate claims he can't have a bowel movement. Medical tells us he's being treated. He has a bowel movement. I'm not sure that that rises to a level where they should automatically know that this is a condition that he needs to go to the hospital right away. Is that a question of law or a question of fact? Well, I think they're undisputed facts. So I don't know that we have to get into that. But I think the question of law is, is there enough there to notify them that this is clearly, obviously a condition which is not being treated? And I would assert that there's nothing in that scenario which would put these officers on notice. Well, this is on your motion for qualified immunity, not their summary judgment motion to establish damages and liability. Correct. Correct. And so we are stuck with the facts, but I don't think these facts are in dispute. But there's nothing that would notify these officers that the treatment that he's receiving is so cursory as to be no treatment because it appears that he is getting better. And that's exactly what Dr. Kayyad said in his expert opinion was the normal course of this disease. And I see my time is up. Thank you much. Thank you. Thank you both for your efforts. We'll take the case under advisement and proceed to the last of the cases this morning.